IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATHANIEL JOHNSON, Individually and as<br>Heir to the Estate of Josie Johnson, Deceased | : <br> : <br> : | CIVIL ACTION |
| v. | : <br> : | |
| METLIFE BANK, N.A., Successor to BNY<br>Mortgage Company, LLC, et al. | : <br> : | NO. 11-800 |

## MEMORANDUM

Padova, J.                                                                                              September 21, 2011

      This action arises out of a 2007 reverse mortgage transaction pursuant to which Plaintiff Nathaniel Johnson conveyed his interest in his family home to his mother, Josie Johnson, and then Josie Johnson entered into a reverse mortgage with BNY Mortgage Company, LLC ("BNY"). The Second Amended Complaint asserts claims of unfair and deceptive practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201-1 et seq., against Defendant Met Life Bank, N.A., the successor to BNY, as well as against three assignees of the mortgage: Defendants World Alliance Financial Corp. ("World Alliance"), Reverse Mortgage Solutions, Inc. ("RMS"), and Bank of America Corporation ("BoA") (collectively, the "Assignees"). The Assignees have filed Motions to Dismiss the claims against them, arguing they cannot be held liable for BNY's allegedly unfair and deceptive practices. In response, Plaintiff has filed a Motion for Leave to File a Third Amended Complaint. For the following reasons, we grant the Motion for Leave to File a Third Amended Complaint, and dismiss the Motions to Dismiss as moot.

**I.    BACKGROUND**

      According to the Second Amended Complaint, Plaintiff and his mother, Josie Johnson ("Mother"), were joint owners of a house at 6528 Theodore Street (the "Property"), where they both

lived. (2d Am. Compl. ¶¶ 13, 17, 19.) Although Plaintiff was initially the sole holder of the deed, he arranged in 1996 for Mother's name to be placed on the deed as well, to ensure that Mother would be able to keep the property if Plaintiff passed away. (Id. ¶ 17.)

In 2007, a BNY representative solicited Mother, who was then 81 years old, asking if she needed money for any purpose and suggesting that she could obtain money through a mortgage loan. (Id. ¶¶ 20, 22.) When Mother expressed some interest, another BNY representative visited Mother at the Property. (Id. ¶ 21, 24.) Mother told the BNY representative that she and Plaintiff were interested in a loan for Property repairs, but that they had been turned down for such loans in the past because of Plaintiff's poor credit. (Id. ¶ 28.) The BNY representative visited Mother several additional times at the Property, primarily during work hours when Plaintiff was not there. (Id. ¶¶ 32, 38.) The representative persuaded Mother to apply for and take out a reverse mortgage. (Id. ¶ 41.) The transaction that the representative planned had two components. (Id. ¶ 29.) First, Plaintiff would execute a deed, transferring his interest in the Property to Mother and, then, Mother alone would take out the reverse mortgage. (Id. at ¶ 29) The representative structured the transaction in this way, at least in part, because Plaintiff was not old enough to qualify for a reverse mortgage. (Id. ¶ 36.)

The loan closing took place on October 27, 2007, at the Property. (Id. ¶¶ 42-43.) Mother signed all of the papers that required her signature before Plaintiff returned home. (Id. ¶ 51.) When Plaintiff arrived, he was rushed through the papers that he needed to sign, including the deed transferring his interest in the Property to Mother. (Id. ¶¶ 50-51, 53.) As a result, Plaintiff did not know or understand the papers that he signed. (Id ¶ 51.) According to the Second Amended Complaint, no one explained to Plaintiff that any of the documents he was signing would transfer

his interest in the property in any way, much less that one of the documents was a deed that would take title to the property out of his name. (Id. ¶¶ 54-55.)

The reverse mortgage product that the BNY representative sold to Plaintiff and Mother was "entirely unsuitable" for their needs, because (1) Mother was not expected to live much longer; (2) both Plaintiff and Mother desired Plaintiff to retain the home upon Mother's death; (3) a balloon payment would come due upon Mother's death; and (4) Plaintiff was unlikely to qualify for a loan to pay off the balloon payment when it came due. (Id. ¶ 30.) In fact, Mother died on December 10, 2009. (Id. ¶ 3.) Pursuant to the terms of the loan, the full principal balance came due upon Mother's death. (Id. ¶ 57, 78.) On November 15, 2010, BNY assigned the mortgage to Goldman Sachs Mortgage Company, which, in turn, assigned the mortgage to World Alliance the very next day. (Id. ¶ 87.) On December 10, 2010, the mortgage loan servicer demanded payment of $66,609.85, which was the principal balance due on the loan plus interests and fees. (Id. ¶ 79.) Plaintiff was unable to pay the amount demanded. (Id. ¶ 80.) Thereafter, on March 28, 2011, World Alliance assigned the mortgage to RMS for the benefit of BoA. (Id. ¶ 82.)

Plaintiff's Second Amended Complaint asserts claims for damages under the UTPCPL arising out of BNY's "unfair or deceptive practices" in connection with the reverse mortgage. See 73 Pa. Stat. Ann. § 201-2. The Complaint also seeks reformation of the loan. The Assignees have filed motions to dismiss the claims against them, arguing that, as mere assignees of the mortgage, they cannot be liable under the UTPCPL for BNY's misrepresentations. See, e.g., Murphy v. Federal Deposit Ins. Corp., 408 F. App'x 609, 611 (3d Cir. 2010) ("The UTPCPL . . . does not impose liability on assignees.") Plaintiff concedes in his Response to the Assignees' Motions to Dismiss that he cannot obtain damages from the Assignees. He asks, however, both in his response to the

Assignees' Motions, and in his Motion for Leave to File a Third Amended Complaint, that he be permitted to file a Third Amended Complaint. The proposed Third Amended Complaint omits any damages claims against the Assignees pursuant to the UTPCPL, but adds two counts asserting claims against all four Defendants for rescission under the UTPCPL (Count II) and to quiet title (Count III). All four Defendants oppose the Motion for Leave to File a Third Amended Complaint, arguing that the amendments Plaintiff proposes are futile.

The factual allegations in the proposed Third Amended Complaint are nearly identical to the factual allegations in the Second Amended Complaint, with only a few additions. Plaintiff adds to the proposed Third Amended Complaint allegations that: (1) on April 20, 2011, RMS, for the benefit of BoA, commenced a foreclosure action against the Property (3d Am. Compl. ¶ 81), (2) BNY did not advise Plaintiff or Mother, at the time of the October 27, 2007 transaction or any time thereafter, of their right to cancel the transaction pursuant to the UTPCPL, 73 Pa. Stat. Ann. § 201-7 (id. ¶¶ 85-87); and (3) Plaintiff sent notices to Defendants on June 29, 2011, stating that he was rescinding the October 27, 2007 transaction, but no Defendant has acknowledged or effectuated the rescission. (Id. ¶¶ 98, 103-04.)

## II.    LEGAL STANDARD

"[A] motion for leave to amend a complaint [is] addressed to the sound discretion of the district court," <u>Cureton v. Nat'l Collegiate Athletic Ass'n</u>, 252 F.3d 267, 272 (3d Cir. 2001), but "the Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). As a general matter, we may only deny leave to amend for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of

amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). "The first four of these reasons devolve to instances where permitting amendment would be inequitable." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). "Thus amendment must be permitted . . . unless it would be inequitable or futile." Id.

Futility in this context "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (citation omitted). In assessing futility, we apply the same standard of legal sufficiency as applies under Federal Rule of Civil Procedure 12(b)(6). Id. (citations omitted). We therefore take the factual allegations of the proposed amended complaint as true, draw all reasonable inferences in favor of the plaintiff, and only deny the motion to amend if the factual allegations in the complaint do not raise plausible claims and are not sufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)); Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

**III.    DISCUSSION**

Defendants argue that we should deny Plaintiff's Motion for Leave to File a Third Amended Complaint, contending that the proposed amendment is futile for two reasons. First, they contend that Plaintiff does not have standing to bring a claim for rescission. Second, they argue that the UTPCPL provision on which the rescission claim in Count II is based, 73 Pa. Stat. Ann. § 201-7(a),

is preempted by the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 <u>et seq.</u>[1]

**A.      Standing**

Plaintiff's UTPCPL rescission claim arises under § 201-7 of the UTPCPL, which requires a seller of goods or services to advise the buyer of the goods or services that he has the right to rescind the sale transaction within three business days of the transaction. <u>See</u> 73 Pa. Stat. Ann § 201-7(a). According to Plaintiff, he was never advised of his right to rescind the October 2007 transaction and, as a result, the three day rescission period never began to run and, to this day, he retains the right to rescind the transaction.[2] Defendants argue, however, that Plaintiff does not have standing to bring a UTPCPL rescission claim, because the statute only requires a seller to notify a "buyer" of his right to rescind, and Plaintiff does not qualify as a "buyer."

Section 201-7 provides in pertinent part as follows:

> Where goods or services having a sale price of twenty-five dollars ($25) or more are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made.

73 Pa. Stat. Ann. § 201-7(a). The seller must provide the buyer with a written "Notice of

---

[1] Although Defendants ask that we deny Plaintiff leave to file the Third Amended Complaint because both claims that Plaintiff seeks to add are futile, their futility arguments are almost exclusively directly to the UTPCPL rescission claim in proposed Count II, and they do not separately address the Quiet Title claim in proposed Count III. Ultimately, however, this apparent oversight is inconsequential, because we conclude that the UTPCPL rescission claim is not futile and, therefore, grant Plaintiff leave to file the Third Amended Complaint on that basis.

[2] <u>See</u> <u>Culbreath v. Lawrence J. Miller, Inc.</u>, 477 A.2d 491, 495 (Pa. Super. Ct. 1984) ("The three-day cancellation period does not begin to run until the buyer is informed of the right to cancel and is provided a cancellation form." (citing 73 Pa. Stat. Ann. § 201-7(e))).

Cancellation," which includes specific information that is set forth in the statute. Id. § 201-7(b)(2). The UTPCPL provides a private right of action for violation of § 201-7. Culbreath v. Lawrence J. Miller, Inc., 477 A.2d 491, 500 (Pa. Super. Ct. 1984). As relief, a plaintiff may recover monetary damages and/or such "other relief as the court deems necessary or proper." 73 Pa. Stat. Ann. § 201-9.2(a).

As noted above, Defendants argue that Plaintiff has no standing to bring an action for violation of § 201-7, because he does not qualify as a "buyer" under the statute. Defendants maintain that Plaintiff is best characterized as a seller in the transaction at issue, because he conveyed his ownership interest in the Property to Mother, and they rely on case law stating that sellers cannot bring claims under § 201-7. See, e.g., DeFazio v. Gregory, 836 A.2d 935, 939 (Pa. Super. Ct. 2003) (holding that "a seller cannot bring a private right of action under Section 201-9.2 and a seller does not have a right to rescind under Section 201-7.")

The UTPCPL does not include a definition of the term "buyer." "Where we have not been provided with a definition, [we must] construe words 'according to their common and approved usage.'" Id. (quoting 1 Pa. Cons. Stat. § 1903(a)). In considering the meaning of "buyer" in § 201-7, the Pennsylvania Superior Court has relied on Webster's Dictionary, which defines the term "as 'PURCHASER' and [defines] "purchaser' as 'one that purchases: . . . one that acquired property for a consideration (as of money): BUYER, VENDEE . . . ." Id. (quoting Webster's Third New Int'l Dictionary 1845 (1976)). In contrast, Webster's defines "seller" as "one that offers for sale." Id. (quoting Webster's Third New Int'l Dictionary 2062 (1976)).

Applying these definitions in the instant case, we conclude that Plaintiff has alleged sufficient facts to support a plausible claim that he was a "buyer" of BNY's mortgage services and/or products

and was not, instead, a "seller" of his ownership interest in the Property. The Third Amended Complaint alleges and raises reasonable inferences that BNY, through its representatives, solicited Mother, seeking to sell her a mortgage loan. (3d Am. Compl. ¶¶ 20, 31.) Mother advised a BNY representative that both she and Plaintiff, joint owners of the Property, were interested in obtaining a loan. (Id. ¶ 28.) In selling the reverse mortgage product, the BNY representative "led [Plaintiff and Mother] to believe that both of them [would be] 'borrowers,'" and assured Plaintiff and Mother that the reverse mortgage would satisfy both of their needs. (Id. ¶¶ 35, 61.) While only Mother ultimately signed the mortgage application and executed the Mortgage, BNY could not have issued the Mortgage to her without Plaintiff's cooperation in deeding his interest in the Property to Mother. (Id. ¶¶ 36-37, 48.) Moreover, although Plaintiff understood that the papers that he signed at the closing were necessary to the loan closing, he did not understand that he was giving up his ownership interest in the Property. (Id. ¶¶ 54-55.)

These allegations support a facially plausible claim that Plaintiff was a buyer of BNY's loan services, having obtained those services in exchange for his relinquishment of his ownership interest in the Property. Although Plaintiff is not named as a borrower in the Mortgage itself, the allegations, read in the light most favorable to him, support the inference that he, along with Mother, enlisted BNY's services in order to procure a loan and that he was an integral part of the resulting mortgage transaction insofar as he was required to give up something of significant value in order to consummate that transaction. Certainly, Plaintiff's theory in this regard, along with the supporting allegations, are sufficient to state a non-speculative claim, which Plaintiff should be permitted to pursue and further develop in fact discovery.

We find further support for our conclusion that Plaintiff's proposed Third Amended

Complaint states a claim upon which relief may be granted in the recent case of In re Fowler, 425 B.R.157 (E.D. Pa. 2010). In Fowler, defendant Gennaro Rauso contacted and met with plaintiff Rhodie Fowler, offering to help her to stop the impending loss of her home to foreclosure. Id. at 164. Thereafter, Rauso orchestrated a foreclosure-avoiding transaction whereby Fowler and her husband transferred title to their home to Rauso for no consideration, granted a $60,000 mortgage on the home to a company that Rauso controlled, and then leased the home back from Rauso with an option to repurchase within one year. Id. When the Fowlers subsequently attempted to rescind the transaction, relying on the protections of 73 Pa. Stat. Ann. § 201-7, Rauso resisted, contending that they had no right to rescind because they were not "buyers" within the meaning of that term in § 201-7 but, rather, were "sellers," because they sold their property to Rauso, while simply retaining a right to repurchase. See id. at 188.

The Court rejected this argument on summary judgment, explaining that the record evidence demonstrated that the Fowlers "dealt with Rauso as 'buyers' interested in 'purchasing' Rauso's 'services' – *i.e.*, his assistance in avoiding foreclosure on and permanent loss of" their property. Id. The Court cited a number of "considerations" as supporting this conclusion. Id. First, Rauso marketed himself to the Fowlers "as a person possessed of certain unique training, contracts and information that would make him and his services valuable to homeowners interested in avoiding foreclosure." Id. Second, "in entering the transaction with Rauso, [the Fowlers] never had the slightest interest in selling the[ir] Property," and were only "convinced to enter into the transaction after Rauso pitched the idea that the *temporary* transfer of title to the . . . Property . . . would help [them] avoid foreclosure and *keep* the property in the long term." Id. at 188-89. Third, Rauso never paid anything to the Fowlers in consideration for obtaining title to their property, whereas the

Fowlers transferred things of value to both Rauso and corporations that he owned and controlled. Id. at 189. The Court therefore concluded that "for purposes of § 201-7 of the UTPCPL, . . . [the Fowlers] were 'buyers' of Rauso's foreclosure intervention and prevention services." Id. (citation omitted).

Applying a similar analysis to the case at hand, we note that the proposed Third Amended Complaint alleges that, like Rouse, the BNY agent marketed herself to Mother as a reverse mortgage specialist, who could assist Plaintiff and Mother with obtaining a loan against their jointly-owned Property. (See 3d Am. Compl. ¶¶ 20, 25, 31.) In addition, the allegations in the Third Amended Complaint, read in the light most favorable to Plaintiff, give rise to the inference that Plaintiff, like the Fowlers, had no interest in selling his interest in the Property and, indeed, did not even realize that he was relinquishing that ownership interest. (See id. ¶¶ 30b, 51, 55, 60.) Finally, given that the mortgage was in Mother's name only, it appears that Plaintiff received nothing of value in return for his relinquishment of his ownership, beyond the loan services that BNY provided. Thus, we conclude that Plaintiff, like the Fowlers, may be able to establish with evidence developed in discovery that he was a "buyer" of BNY's services for purposes of § 201-7 of the UTPCPL.

In sum, we reject Defendants' arguments at this early stage of the proceeding that Plaintiff was necessarily a "seller" of his Property interests rather than a "buyer" of BNY's services and that Plaintiff's claim under § 201-7 is therefore futile because he has no standing to pursue a claim under that statutory provision.[3] We conclude to the contrary that Plaintiff's proposed Third Amended

---

[3] Defendants have also argued that any UTPCPL rescission claim belongs to Mother alone and that Plaintiff does not have standing to bring Mother's claim because he has not alleged that he has been designated the personal representative, personal representative, administrator or executor of Mother's estate. See 20 Pa. Cons. Stat. § 3373 ("[A]n action or proceeding to enforce any right or liability which survives a decedent may be brought by . . . his personal representative alone . . .

Complaint states a plausible claim that Plaintiff was a buyer of BNY's services.

### B.      TILA Preemption

Defendants also argue that Plaintiff's proposed UTPCPL rescission claim is futile because the provisions of the UTPCPL that require sellers to give notice of the right to rescind are preempted by the federal Truth in Lending Act ("TILA"), which requires lenders to provide borrowers with notices of the right to cancel. See 15 U.S.C. § 1635(a). Defendants' preemption argument rests on "conflict preemption," which provides that "state law is nullified to the extent that it actually conflicts with federal law." Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985). Typically, a conflict between state and federal law "arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. Consequently, in order to prevail on their conflict preemption argument, Defendants must establish that the TILA preempts and invalidates the UTPCPL provision on which Plaintiff relies in seeking rescission of the October 27, 2007 transaction, i.e., § 201-7, which requires that a seller provide notice to a buyer of his right to rescind a transaction within three business days of the transaction.

Congress enacted the TILA in order to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). One of the TILA's requirements is that creditors provide borrowers with a "right to rescind the transaction until midnight of the third

---

as though the decedent were alive.")  However, given that we have concluded that Plaintiff has adequately alleged that he himself is a "buyer" within the meaning of that term in § 201-7, we reject Defendants' argument that Plaintiff has no standing because the only cognizable claim under § 201-7 belongs to Mother.

business day following the consummation of the transaction" or three days after the delivery of certain required information and rescission forms, whichever is later. 15 U.S.C. § 1635(a). Regulation Z, which the Federal Reserve Board promulgated to implement the TILA, see <u>Smith v. Fid. Consumer Disc. Co.</u>, 898 F.2d 896, 898 (3d Cir. 1990), further clarifies that creditors must provide consumers with a written "notice of the right to rescind," which "clearly and conspicuously disclose[s]" the right to rescind, how to exercise that right, and the date that the rescission period expires. 12 C.F.R. § 226.23(b).

With respect to its own preemptive effect, the TILA specifically provides that the statute does "not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions <u>except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency</u>." 15 U.S.C. § 1610(a)(1) (emphasis added). Regulation Z further provides that a state law is only inconsistent with the TILA "if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law." 12 C.F.R. § 226.28(a).

Here, Defendants argue that the cancellation notice requirements in § 201-7 are inconsistent with the TILA's cancellation notice provisions, because § 201-7 "requires additional and different language to be contained in the cancellation notice." (<u>E.g.</u>, RMS's and BoA's Resp. to Pl. Mot. for Leave to File 3d Am. Compl., at 12.) However, both statutes require that the consumer be provided with notice of the right to rescind the transaction within three business days. <u>Compare</u> 73 Pa. Stat. Ann. § 201-7(a) <u>with</u> 15 U.S.C. § 1635(a). Where, as here, Plaintiff alleges that he was not provided with any notice of the right to cancel the October 2007 transaction, much less a notice that stated that he could rescind within three days, there is no material inconsistency between the notice

requirements in the two statutes. Given that the UTPCPL is only preempted "to the extent that [it is] inconsistent with the provisions of [the TILA]," 15 U.S.C. § 1610(a)(1), and the two statutes are not inconsistent insofar as they both require notice of a three-day cancellation period, we are not convinced that the UTPCPL is preempted insofar as it mandates notice of the three-day rescission period. We therefore reject Defendants' argument that Plaintiff's rescission claim based on the UTPCPL's three-day notice period is futile because it is preempted by the TILA.

## IV.   CONCLUSION

For the foregoing reasons, we reject Defendants' arguments that the rescission claims in Plaintiff's proposed Third Amended Complaint are futile, and we therefore exercise our discretion to grant Plaintiff's Motion for Leave to File a Third Amended Complaint. Moreover, given that the Third Amended Complaint addresses the pleading infirmities that the Assignees raised in their Motions to Dismiss the Second Amended Complaint, we dismiss the Defendants' Motions to Dismiss the Second Amended Complaint as moot.

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

John R. Padova, J.